STATE OF CONNECTICUT *v.* THOMAS E. MARRA, JR.
(13537)

PETERS, C. J., SHEA, GLASS, COVELLO and HULL, Js.

Argued May 4—decision released July 24, 1990

*Timothy P. Pothin,* with whom were *Frank J. Riccio* and, on the brief, *Jonathan J. Einhorn,* for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Robert Lacobelle,* assistant state's attorney, for the appellee (state).

GLASS, J. The charges against the defendant, Thomas E. Marra, Jr., arose in connection with a series of events surrounding the disappearance of Richard Noel on January 23, 1984. The state charged the defendant in December, 1987, with one count of conspiracy to commit kidnapping in the first degree in violation of General Statutes §§ 53a-48 and 53a-92 (a) (2) (A),[1] two counts of attempted kidnapping in the first degree in violation of General Statutes §§ 53a-49[2] and 53a-92, one

---

[1] "[General Statutes] Sec. 53a-48. CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

"[General Statutes] Sec. 53a-92. KIDNAPPING IN THE FIRST DEGREE. (a) A person is guilty of kidnapping in the first degree when he abducts another person and when . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

[2] "[General Statutes] Sec. 53a-49. CRIMINAL ATTEMPT: SUFFICIENCY OF CONDUCT; RENUNCIATION AS DEFENSE. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission of constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or

count of arson in the second degree in violation of General Statutes § 53a-112 (a) (1) (B),[3] two counts of larceny in the second degree in violation of General Statutes § 53a-123 (a) (1),[4] and one count of accessory to kidnapping in the first degree in violation of General Statutes §§ 53a-8[5] and 53a-92 (a) (2) (A). The jury subsequently found the defendant guilty on all counts, and he was sentenced to a total effective term of sixty-five years imprisonment. We affirm the judgment of the trial court.

On appeal, the defendant claims that the trial court improperly: (1) denied his motion for judgment of acquittal on the charge of accessory to kidnapping in the first degree because the evidence was insufficient to support the verdict; (2) denied his motion for a mistrial when allegedly prejudicial radio, television and

fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime.

"(c) When the actor's conduct would otherwise constitute an attempt under subsection (a), it shall be a defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[3] "[General Statutes] Sec. 53a-112. ARSON IN THE SECOND DEGREE: CLASS B FELONY. (a) A person is guilty of arson in the second degree when, with intent to destroy or damage a building, as defined in section 53a-100, (1) he starts a fire or causes an explosion and . . . (B) such fire or explosion was intended to conceal some other criminal act . . . ."

[4] "[General Statutes (Rev. to 1983)] Sec. 53a-123. LARCENY IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and: (1) The property consists of a motor vehicle, the value of which is two thousand dollars or less . . . ."

[5] "[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

newspaper publicity during the trial deprived him of a fair trial; (3) permitted the state's rebuttal witness, who had a past history of psychological problems, to testify despite the defendant's inability to obtain his medical or psychological records, thereby denying the defendant an opportunity to cross-examine the witness effectively; (4) denied his motion for a mistrial when the court clerk read previously redacted portions of a warrant affidavit referring to pending murder charges against him and thus deprived him of a fair trial; and (5) allowed the state to introduce prejudicial evidence of his uncharged larcenous misconduct, when two of the charges for which he was on trial involved thefts.

The jury could reasonably have found the following facts. Sometime during 1981, the defendant began selling stolen automobiles to J. W. Ownby, who lived in Kansas City, Missouri. The defendant's job was to deliver the stolen autos to New York City, where Ownby would pick them up and drive them back to Kansas City. In 1982, the defendant introduced Noel, the victim, to Ownby. When Ownby became too ill, the defendant hired Noel to drive stolen autos to Ownby in Kansas City.

Ownby and Noel proceeded to develop a friendly relationship. When Ownby and the defendant argued over the manner in which Noel would be paid, Ownby opted to pay Noel himself, rather than honor the defendant's request that Ownby pay the defendant, and allow the defendant to remit part of the payment to Noel. In the summer of 1983, Ownby began dealing directly with Noel. Shortly thereafter, Ownby terminated almost all of his dealings with the defendant, and began dealing primarily with Noel. The defendant was "aggravated" with the situation, and his relationships with Ownby and Noel subsequently deteriorated.

In the meantime, the police had begun investigating auto theft in the Bridgeport area, and the defendant became a subject of that investigation in April, 1983. The police informed the defendant in October, 1983, that he was a subject of their investigation. During the remaining months of 1983, the police conducted continuous, visible surveillance operations outside the defendant's home so that the defendant was made aware that the police were watching him. In November, 1983, Noel implicated the defendant in statements to the police, and the defendant later became aware of Noel's conversations with the police.

Near the end of 1983, the defendant asked Frank Spetrino to steal a van for him, specifically requesting a van with no windows. Spetrino then stole a blue van for the defendant on December 21, 1983. On the same night, Spetrino called the defendant to arrange for delivery of and payment for the van. Spetrino and the defendant then went to James Kallman's apartment at Pallisade Avenue in Bridgeport. There, they met Kallman, Nicky Byers, Shawn Burns and Paul Lentine. The defendant asked Spetrino to help him and the others force Noel into the van. The defendant had previously offered to pay Byers several hundred dollars to hit Noel over the head with an axe handle and drag him into the van. Byers, Spetrino, Kallman, Burns and Lentine, carrying guns and other weapons, rode in the van to 141 French Street in Bridgeport, the location of Noel's apartment, while the defendant followed in his own car. Spetrino noticed that the van contained a fifty gallon drum that had not been in the van at the time he had stolen it. The group parked outside Noel's apartment, near his car, and waited approximately one hour for him to appear. When Noel failed to appear, the group abandoned the plan and disbanded.

On or about the same day, all of these men went to Robin O'Neill's apartment on Charles Street in Bridge-

port. They used the blue van for transportation, and carried guns and other weapons. Kallman, in accordance with a scheme concocted by the defendant, gave O'Neill cocaine and asked her to use the drugs to entice Noel out of the Shamrock Pub, a nearby nightclub. The plan, again engineered by the defendant, was to knock Noel out when he entered the apartment, drag him through the back door of the apartment and throw him into the van. The defendant drove O'Neill to the Shamrock Pub, and when she returned alone, the defendant sent Alex Palmieri into the pub to find Noel. Palmieri was also unsuccessful, and this plan was also abandoned. Later, on January 12, 1984, Burns burned the blue van.

Subsequently, the defendant asked Spetrino to steal another van for him, and on January 21, 1984, Spetrino stole a van that was two-toned in color, white on the top and green or aqua on the bottom. That same evening, Spetrino parked the van, and called the defendant to inform him of the van's location. The next day, Spetrino noticed that the van was gone. On January 22, 1984, Ownby called the defendant from a hotel in Bridgeport, and asked the defendant to pick him up and drive him to a motel in Fairfield. The defendant picked up Ownby and a Hispanic man named Julio after 9 p.m., and drove them to a motel in Fairfield. During the drive, Ownby indicated to the defendant that after that night, there would be no more problems with Noel.

Early the following morning, on January 23, 1984, Margaret Vias awoke at approximately 2 a.m. to the sound of a male voice, coming from outside, screaming: "No, no!" Vias lived on the second floor of the apartment building at 141 French Street, the same building where Noel lived. Looking out of her window, Vias observed two white men near the doors of the building, quickly carrying the limp body of another man by his arms and legs down the sidewalk towards a van

parked in front of the building. The two men tossed the other man into the van, which Vias described as yellow, at least ten years old, with a sliding door on the passenger side. A third person, according to Vias, accompanied the two men. Later that morning, Vias went outside and observed a large puddle of blood near the door of the building, a clump of dark brown hair near the puddle, blood splattered from the puddle over to the place where the van had been parked, and a set of keys.

At approximately 3 a.m. on January 23, 1984, the same morning that Vias viewed the scene from her window, the defendant received a call from Ownby, who requested that the defendant pick him up, help him dispose of a van and drive him to the airport. The defendant picked up Ownby and Julio, and drove them to a restaurant in Stratford. In the restaurant parking lot, the defendant saw a green and white van, and asked Ownby whether Noel's body was in the van. Ownby replied: "We already took care of it." The defendant then looked into the van, and observed a large quantity of blood on its floor, door and sides. Followed by Ownby and Julio in the van, the defendant next drove to a factory on Lordship Boulevard in Stratford, stopping along the way to purchase a container full of gasoline. Ownby told the defendant that the van had to be destroyed because it was used in the murder of Noel. The defendant then doused the inside of the van with gasoline, and Julio ignited the van. The police discovered the burning van behind the factory at 5:22 a.m.

After the van was in flames, Ownby asked the defendant to drive him to Union Square dock in Stratford, indicating that he wanted to make sure that the container or barrel went down. The defendant drove Ownby and Julio to the dock, and parked on the ramp with his high beams illuminating the ice below. Ownby

got out of the car, and pointed to a drum on the ice, indicating that Noel's body was in the drum. Ownby then broke the ice below the drum, and the drum sank. When he got back into the car, Ownby told the defendant that "there would be no more problems with Richie [Noel]." The defendant then drove Ownby and Julio to a limousine service in Norwalk, where Ownby and Julio arranged for transportation to the airport.

On January 24, the next day, the defendant called a Stratford garage, identified himself as the manager of a Bridgeport limousine service where Noel was employed, and requested that the garage tow the limousine that Noel drove. The defendant then drove by Noel's house and noticed that the limousine was gone. Three days later, the defendant called another Stratford garage, identified himself as Noel, and requested that the garage tow Noel's personal car. The defendant also, at some point, asked Spetrino to break into Noel's apartment and mailbox for the specified purpose of taking Noel's personal papers and mail, especially bank mail. Spetrino entered Noel's apartment and mailbox on several occasions, and stole a bank envelope, other mail and personal papers belonging to Noel, all of which he delivered to the defendant. The defendant also called Nusite Realty Company, the owner of Noel's apartment building, identified himself as Noel, and obtained keys to Noel's apartment.

In mid-February of 1984, the defendant gave Tamara Thiel ten dollars, and directed her to open a bank account in the name of Marjorie Shea, Thiel's aunt. The defendant brought Thiel to his home on or about February 23, 1984, showed her Noel's driver's license, and told her to forge Noel's signature on a check in the amount of $4500, payable to the order of Marjorie Shea. The defendant, wearing gloves, wiped off the check with a towel and placed it in an envelope. The check

was presented for deposit in the Shea account on February 27, 1984. Two days after Thiel opened the Shea account, the defendant directed Thiel to call the bank where Noel's account was located, claim she was Noel's fiancee, and state that she needed to withdraw money for Noel, who was in Kansas City. The bank, however, refused to release the money.

On or about February 24, 1984, Thiel forged a second check at the defendant's direction. The second check, in the amount of $700, was made payable to Nusite Realty Company. Nusite had previously received a telephone call by a male caller who identified himself as Noel, stated that he was in Kansas City and that he would forward a check covering two months rent. Nusite's manager received the forged rent check in an envelope bearing a return address in Kansas City, and deposited it on March 5, 1984. Since Noel's bank had by this time begun to suspect that someone was tampering with his checks, the check was returned. The bank then closed Noel's account on March 8, 1984. Subsequently, the bank returned two additional checks drawn on Noel's account that had been made payable to Marjorie Shea. The bank determined that none of these checks had been signed by Noel. Furthermore, on or about March 27, 1984, acting with the belief that Noel was dead, the defendant filed a lawsuit to collect on a promissory note in the amount of $18,000, on which Noel appeared as the maker, and the defendant as the payee. The suit resulted in a judgment in favor of the defendant.

I

The defendant's first claim is that the state's evidence was insufficient to support a guilty verdict on the charge of accessory to kidnapping in the first degree, and therefore the trial court should not have denied his motion for judgment of acquittal. We disagree.

"When a verdict is challenged because of insufficient evidence, the issue is whether ' " 'the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt.' " ' *State* v. *Braxton,* 196 Conn. 685, 691, 495 A.2d 273 (1985), quoting *State* v. *Stepney,* 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). Appellate analysis of a claim of insufficiency of the evidence requires us to undertake a twofold task: We must first review the evidence construing it in the light most favorable to sustaining the trial court's verdict. *State* v. *Williams,* 205 Conn. 456, 468, 534 A.2d 230 (1987); *State* v. *Vincent,* 194 Conn. 198, 206, 479 A.2d 237 (1984); *State* v. *D'Antuono,* 186 Conn. 414, 421, 441 A.2d 846 (1982); *State* v. *Perez,* 102 Conn. 603, 606, 438 A.2d 1149 (1981). ' " 'We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct.' " ' *State* v. *Plourde,* 208 Conn. 455, 458, 545 A.2d 1071 (1988), quoting *State* v. *Rollinson,* 203 Conn. 641, 665–66, 526 A.2d 1283 (1987), and cases cited therein." *State* v. *Avis,* 209 Conn. 290, 308–309, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989).

The defendant's challenge to the sufficiency of the evidence in this case is a limited one. He claims only that the state failed to adduce evidence sufficient to prove beyond a reasonable doubt that Noel was in fact abducted, and that the defendant actually aided in the

abduction of Noel. Having charged the defendant with accessory to kidnapping in the first degree in violation of General Statutes §§ 53a-92 (a) (2) (A) and 53a-8, it was the state's burden to prove each of these elements beyond a reasonable doubt. General Statutes § 53a-91 (2)[6] defines, in part, the parameters of the state's burden with respect to the element of abduction, providing that the word "abduct" means "to restrain a person with the intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use physical force or intimidation." This definition is clarified by § 53a-91 (1),[7] which provides in pertinent part that the phrase "to restrain" means "to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another." As for the defendant's actual role in Noel's abduction, the state was required under § 53a-8 to prove that the defendant "intentionally aide[d] another person" to commit the crime of kidnapping in the first degree. Construing the evidence adduced at trial in the light most favor-

---

[6] "[General Stautes] Sec. 53a-91. DEFINITIONS. The following definitions are applicable to this part . . . .

"(2) 'Abduct' means to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use physical force or intimidation."

[7] "[General Statutes] Sec. 53a-91. DEFINITIONS. The following definitions are applicable to this part:

"(1) 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein 'without consent' means, but is not limited to, (a) deception and (b) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement."

able to sustaining the jury's verdict, we believe that the jury could reasonably have concluded that such evidence, albeit primarily circumstantial, established beyond a reasonable doubt that Noel was in fact abducted, and that the defendant actually aided in that abduction.

To prove that Noel was in fact abducted, the state established at trial that he resided in an apartment building located at 141 French Street in Bridgeport. Eyewitness testimony further established that at approximately 2 a.m. on January 23, 1984, and within a time span of ten seconds, a male screamed and was physically carried by the arms and legs from that same apartment building and thrown into a waiting van. The defendant himself stated in an interview, admitted into evidence, that Ownby claimed to have murdered Noel the same morning, and indicated to him that Noel's body was in a drum that eventually sank beneath the icy waters at Union Square dock in Stratford. From this evidence, coupled with the fact that Noel was reported missing by his mother on March 10, 1984, and that he has not been seen or heard from since January 23, 1984, we conclude that the jury could reasonably have inferred that the man who was physically moved from Noel's residence to the waiting van was in fact Noel.

Moreover, we cannot say that the jury could not reasonably have inferred, in light of the sheer volume of circumstantial evidence adduced at trial, that the defendant actually aided in the abduction of Noel. Testimony by Spetrino established that he stole a green and white van at the defendant's request on January 21, 1984. The defendant was informed on that date of the van's location, and the van was moved from that location by January 22, 1984. From this evidence, the jury could reasonably have inferred that the defend-

ant procured a green and white van from Spetrino, and was in possession of that van on January 22, 1984, the day before Noel was abducted. The fact that an eyewitness described the van used in Noel's abduction as yellow is not a fatal flaw in the state's evidence. The jury could reasonably have inferred that the green and white van was actually used to kidnap Noel, and that the witness merely mistook the van's color for yellow, or that the lighting conditions at 2 a.m. distorted the witness's perception of the van's color. Furthermore, the witness's description of the van used in the kidnapping, aside from its color, coincided with the green and white van in several pertinent respects, such as its approximate age, physical condition, and physical attributes including the presence of a sliding door on the passenger side. Consequently, it was reasonable for the jury to infer that the green and white van was actually used in the kidnapping of Noel.

It was also reasonable for the jury to conclude that the defendant supplied the green and white van to Ownby as the means to transport Noel. The defendant's testimony that Ownby, Noel's kidnapper, did not arrive in Connecticut until 7 p.m. on January 22, 1984, supports such an inference, and this inference is strengthened by: (1) the defendant's admitted participation in the destruction of the green and white van, which evidenced his consciousness of guilt; (2) his towing of Noel's business and personal cars; and (3) his attempt to pay Noel's rent. Of even greater significance, however, were the defendant's two prior attempts to kidnap Noel in a manner strikingly similar to that of Noel's actual kidnapping. In each of the attempts, the defendant directed various assistants to hit Noel in the head, drag him out of an apartment building, and throw him into a waiting van stolen by Spetrino. This scenario is virtually identical to the one observed by the eyewitness to the kidnapping of Noel.

From the similarity of the attempts to the kidnapping, it was reasonable for the jury to infer that the defendant's role in the kidnapping was at least to supply the van to the actual kidnapper, who then accomplished what the defendant himself had attempted to do at an earlier date. We cannot say, therefore, that the jury could not reasonably have inferred that the defendant actually aided in the kidnapping of Noel.

## II

The defendant next claims that the trial court should have granted his motion for a mistrial alleging that inflammatory radio, television and newspaper publicity during his trial deprived him of a fair trial. He maintains that the trial court should have found the publicity so inherently prejudicial as to create a presumption of prejudice on the part of the jury. The publicity claimed to be prejudicial focused on a scuba diving operation conducted in Stratford by the Bridgeport police, and designed to uncover evidence related to the disappearance of Noel, as well as other associates of the defendant. Apparently, divers discovered a partial skeleton and pieces of a metal barrel. Accounts of the discovery and the circumstances surrounding the defendant's case were released over a period of three days by the Bridgeport Telegram, the Bridgeport Post, WICC radio in Bridgeport, WTNH channel 8 television in New Haven and Cablevision 12 in Fairfield. In support of his motion for a mistrial, the defendant proffered evidence of such accounts including six newspaper articles, transcripts of seventeen short radio broadcasts, and two videotapes of televised news segments.

The trial court responded to the defendant's motion for a mistrial by questioning the jurors as to whether they had been exposed to any news accounts concerning the case. Two jurors admitted to having heard radio broadcasts discussing the case. The court further ques-

tioned these two jurors out of the presence of the other jurors, and excused one juror, who revealed that he believed that the defendant was guilty as a result of hearing the broadcast. The second juror, having heard only part of a broadcast, was permitted to remain on the jury after explaining that he had promptly turned off the radio, had not formed any opinion as a result of hearing the broadcast, and believed that he could decide the case on the basis of the evidence presented in the courtroom. Although the court offered defense counsel an opportunity to question this juror, counsel declined. The trial court then denied the defendant's motion for a mistrial.

The defendant contends that inherent prejudice grew from the media's speculations that the newly discovered evidence directly linked him to the disappearances of Noel, and a second associate, and also to the murder of a third associate, Alex Palmieri, with respect to whom a murder charge was then pending against the defendant. The defendant claims that the media reports therefore connected him "at least implicitly to three possible murders." Further, the defendant argues that inherent prejudice stemmed from the media's references to his prior convictions. He concludes that the effect of such publicity was "to make a spectacle of the trial."[8]

At the outset, we note that "[a] motion for a mistrial is granted only where it is apparent to the court that

---

[8] The defendant also claims on appeal that the state's attorney's office initiated the scuba diving operation, deliberately chose to undertake the operation mid-trial, and supervised the operation outside the courtroom, all of which provided the impetus for the publicity that deprived him of a fair trial. Further, since several of the media releases quoted a witness for the state, the defendant argues that the state's attorney violated rule 3.6 of the Rules of Professional Conduct. Since the defendant did not preserve this issue in the trial court, however, we decline to review the issue on appeal. Practice Book § 4185; *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989); *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973).

some occurrence during the trial has deprived a party of the opportunity for a fair trial." *State* v. *Cruz,* 212 Conn. 351, 364, 562 A.2d 1071 (1989). "The trial court's exercise of its broad discretion to determine whether a motion for a mistrial should be granted will be reversed on appeal only if that discretion has been abused." Id. " ' "The general rule is that on appeal a defendant has the burden of proving actual jury prejudice if a conviction is to be reversed on grounds of prejudicial publicity . . . . " ' " *State* v. *Miller,* 202 Conn. 463, 477, 522 A.2d 249 (1987), quoting *State* v. *Marra,* 195 Conn. 421, 428, 489 A.2d 350 (1985).

Nonetheless, "there is no need to show actual prejudice in the jury box 'in extreme circumstances where there has been inherently prejudicial publicity such as to make the possibility of prejudice highly likely or almost unavoidable. See *Estes* v. *Texas,* 381 U.S. 532, 542–43, 85 S. Ct. 1628, 14 L. Ed. 2d 543, reh. denied, 382 U.S. 875, 86 S. Ct. 18, 15 L. Ed. 2d 118 (1965).' *Calley* v. *Callaway,* 519 F.2d 184, 204 (5th Cir.), cert. denied sub nom. *Calley* v. *Hoffman,* 425 U.S. 911, 96 S. Ct. 1505, 47 L. Ed. 2d 760 [1976]." *State* v. *Piskorski,* 177 Conn. 677, 686, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). Our decision in *Piskorski* extensively analyzed those United States Supreme Court cases in which prejudice was presumed. Id., 686–89; see *Sheppard* v. *Maxwell,* 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); *Estes* v. *Texas,* supra; *Rideau* v. *Louisiana,* 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963). In this case, however, unlike the cases discussed in *Piskorski,* both the nature and the extent of the publicity claimed to be prejudicial by the defendant fail to rise to the level where prejudice may be presumed.

The extent of the publicity in this case, though released by all segments of the media, was limited in

duration to a three day period. The defendant has made no showing, moreover, that the press, in gathering its information, disrupted the courtroom such that "the trial proceedings were conducted in an atmosphere 'utterly corrupted by press coverage.' " *State* v. *Miller,* supra, 478, quoting *Murphy* v. *Florida,* 421 U.S. 794, 798, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975); see *Sheppard* v. *Maxwell,* supra, 336–38. It is also significant that only two jurors were exposed to the publicity, and that the trial court immediately excused and replaced the juror who had admitted prejudice from the exposure. To prevent further media exposure, the trial court repeatedly admonished the jury not to read, listen to, or watch accounts of the trial. The trial court was entitled to assume, as do we, that the jurors followed its instructions. *State* v. *Vitale,* 190 Conn. 219, 230, 460 A.2d 961 (1983).

As for the nature of the publicity, it was primarily repetitive and factual, and only a few accounts speculated on the connection between the newly uncovered evidence and the defendant's involvement in other crimes. The publicity cannot be characterized as inflammatory, sensationalized or unfair. See *State* v. *Piskorski,* supra, 689. Only a single account referred to the defendant as "the convicted head of a stolen car ring," and whatever prejudice was engendered by this reference was rendered moot by the defendant's own testimony at trial regarding his involvement in an extensive stolen car network and his numerous convictions resulting therefrom. See *State* v. *Marra,* supra, 430. Consequently, we conclude that the publicity in this case was not so inherently prejudicial as to deprive the defendant of a fair trial, and therefore the trial court properly denied the defendant's motion for a mistrial.

### III

Next, the defendant claims that the trial court denied him the opportunity to cross-examine Ownby effectively

by permitting Ownby to testify for the state in rebuttal despite the defendant's inability to obtain his medical or psychological records. Although Ownby's name was on the state's witness list since the beginning of the trial, the defendant claimed that he had been unable to locate Ownby to secure his consent for release of the records, and that he had not attempted to subpoena the records because, he maintained, a subpoena would have been ineffective. After the state presented to the trial court an authorization for release of the records signed by Ownby, and the court ascertained that it would take approximately three weeks to obtain the records, and that the records might not be released despite Ownby's consent, the trial court permitted the defense counsel to voir dire Ownby and to inquire into his psychiatric history on cross-examination. The defendant did not formally object to the trial court's ruling, but argued his claim of inadmissibility to the court and was granted an exception. Cross-examination revealed that Ownby had been diagnosed as a paranoid schizophrenic, and had been found incompetent four times and hospitalized for mental disorders five times since 1962.

The state now argues that because the defendant did not formally object to the trial court's ruling, he failed to preserve the issue for appellate review. The defendant maintains that the issue was properly preserved, and alternatively that he is entitled to review under the principles set forth in *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973). We need not reach the preliminary question of whether the defendant properly preserved the issue for review, or whether he is entitled to *Evans* review, however, because the defendant has failed to fulfill his duty to provide this court with an adequate record for review. See Practice Book § 4061; *State* v. *Snook,* 210 Conn. 244, 256, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d

603 (1989). Almost two years have elapsed between the date that Ownby signed an authorization for release of the records and the date that the defendant's appeal was scheduled for hearing, and yet the defendant has not produced the records, nor has he made any showing to this court that he attempted to obtain the records, or that such an attempt would have been unsuccessful. Without examining the records, we cannot assess whether the defendant's constitutional right to confrontation was impaired by his inability to gain access to the records. We therefore decline to review this claim further.

## IV

The defendant also argues that the trial court should have granted his motion for a mistrial because of the court clerk's reading of previously redacted portions of a warrant affidavit referring to murder charges pending against him that allegedly resulted in denying him a fair trial. The affidavit read by the clerk contained an excerpt of a letter written by the defendant to Kallman, in which the defendant wrote that "they are going to charge me with four murders." Initially, the state offered the full warrant into evidence, and then amended its offer to include only four paragraphs of the warrant affidavit, one of which contained the above quoted excerpt of the defendant's letter, with the references to the murder charges redacted. Defense counsel objected to the state's limited offer, and stated that "on recross, with the permission of [the defendant] who is aware of the full content of the application for search and seizure warrant, I will offer the entire version including those references to four murders and anything else pertaining to the entire investigation that [the police officer] originally put into that application and—because I don't want to have to call him back for purposes of additional testimony in view of his military

commitments. . . . I discussed the matter with [the defendant] and I believe he is in accord with that, what my effort will be to get the entire affidavit into evidence." Over the defendant's objection, the court admitted only the four paragraphs of the affidavit into evidence. The clerk, however, inadvertently failed to redact the affidavit properly, and the original excerpt of the defendant's letter referring to four murder charges was read to the jury.

The defendant immediately moved for a mistrial, stating that he moved for such "notwithstanding the trial strategy that [he had] demonstrated to the Court that [he] was about to embark upon . . . ." After denying the defendant's motion, the court promptly instructed the jury as follows: "[D]isregard any mention of the word murder or charges of murder. . . . Do not pay any heed to those words. . . . We are not concerned in this case whatever with any charges other than the charges on which there is evidence in this courtroom and the charges against [the] defendant." Although the defendant took no exception to the trial court's instruction, he now contends that the trial court's instruction was ineffective to cure the substantial, irreparable prejudice caused by the clerk's error, and hence he was deprived of a fair trial. We do not agree.

" 'The general principle is that a mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial.' " *State* v. *Gooch,* 186 Conn. 17, 25, 438 A.2d 867 (1982), quoting *State* v. *Turcio,* 178 Conn. 116, 143, 422 A.2d 749 (1979). "The trial court's exercise of its broad discretion to determine whether a motion for a mistrial should be granted will be reversed on appeal only if that discretion has been abused." *State* v. *Cruz,* supra, 364.

It is our view that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial. Immediately after the affidavit was read to the jury, the trial court gave a curative instruction to the jury, thereby minimizing any prejudice to the defendant. See *State* v. *Cruz*, supra; *State* v. *Fernandez*, 198 Conn. 1, 17, 501 A.2d 1195 (1985); *State* v. *Ubaldi*, 190 Conn. 559, 563, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). "It is to be presumed that the jury followed the court's instructions unless the contrary appears." *State* v. *Rouleau*, 204 Conn. 240, 254, 528 A.2d 343 (1987). Furthermore, counsel initially objected to the redactions for strategic reasons, while the court, especially sensitive to the defendant's rights, supported the redaction. Counsel obviously did not believe at that time that the introduction of the unadulterated affidavit would be prejudicial, and his representations to the court appear almost to have invited error. In this context, and because the trial court immediately cured the clerk's error by instruction, we do not find that the trial court's denial of the defendant's motion for a mistrial constituted an abuse of discretion.

V

Finally, the defendant argues that the trial court should not have allowed the state to introduce prejudicial evidence of his uncharged larcenous misconduct, because he was on trial, in part, for larceny. The particular evidence of which the defendant complains includes the testimony elicited from Spetrino and Thiel, tending to show that the defendant directed Spetrino to break into Noel's apartment, directed Thiel to open the Shea account and forge Noel's name on Noel's checks, directed the forgery of Noel's name on a promissory note, and later brought suit on the note when he believed that Noel was dead. While the state

maintains that this evidence was offered for the purpose of showing the defendant's motive to aid in Noel's kidnapping, that is, to gain access to his bank accounts, the defendant claims that the evidence was not probative of motive.

We have repeatedly stated that evidence otherwise relevant and material is not rendered inadmissible because it tends to prove that an accused committed other crimes. See *State* v. *James,* 211 Conn. 555, 578, 560 A.2d 426 (1989). "It is widely recognized that other misconduct evidence is admissible to prove motive, as an exception to the general prohibition against such evidence." Id. Nevertheless, prior to ruling on its admissibility the trial court must still consider whether the prejudicial effect of such evidence outweighs its probative value. *State* v. *Sierra,* 213 Conn. 422, 434–35, 568 A.2d 448 (1990). We recognize that this balancing process is an inherently difficult one, and will reverse the trial court's decision only when it is manifest that an abuse of discretion or an injustice has occurred. Id.; *State* v. *Braman,* 191 Conn. 670, 676, 469 A.2d 760 (1983). A review of the record reveals that the disputed evidence proffered by the state was in fact probative, and that its probative value outweighed its prejudicial effect on the defendant. We thus conclude that the trial court properly admitted the evidence.

The evidence was probative of the defendant's motive because if the jury believed that he directed a break-in of Noel's apartment in search of bank mail, and otherwise attempted to gain access to Noel's bank account through check forgeries and a lawsuit to collect on a forged promissory note, such evidence would tend to make it more probable that the defendant assisted in bringing about Noel's absence. Obviously, Noel's absence would facilitate and simplify the defendant's task of gaining access to his funds, for Noel, being

absent, could not detect and object to the unexplained debits on his account statements, and would not attempt to defend the defendant's action on the forged promissory note. The probative value of this evidence, moreover, outweighed the minimal prejudice flowing to the defendant from its admission. This particular uncharged larcenous misconduct evidence was, in the words of the state, "only a drop in the bucket" in light of the defendant's testimony on the stand regarding his commission of numerous other larcenous acts. The defendant testified, for example, that he was then serving a sentence for selling stolen autos and forging cashiers' checks. He also testified that he had been in the stolen car business for approximately ten years, and had been convicted over fifty times for larceny of autos and for forgery of documents relating to the autos. Against this backdrop, we conclude that the evidence claimed to be prejudicial by the defendant was not more prejudicial than it was probative of the defendant's motive in aiding in the kidnapping of Noel.

The judgment of the trial court is affirmed.

In this opinion the other justices concurred.