STATE OF CONNECTICUT *v.* RICHARD DUNTZ
(13990)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued March 24—decision released July 28, 1992

*Denise Dishongh,* special public defender, with whom was *Louis S. Avitabile,* special public defender, for the appellant (defendant).

*Harry Weller,* assistant state's attorney, with whom, on the brief, were *Frank S. Maco,* state's attorney, and *David Shepack,* assistant state's attorney, for the appellee (state).

CALLAHAN, J. The dispositive issue in this appeal is whether three searches of the defendant's apartment

and van were constitutionally reasonable pursuant to article first, § 7, of the Connecticut constitution. Following a trial, the defendant, Richard Duntz, was convicted by a jury of the crime of murder in violation of General Statutes § 53a-54a (a)[1] in connection with the killing of Earl E. Morey II. He was, thereafter, sentenced to a term of imprisonment of sixty years. He has appealed his conviction to this court pursuant to General Statutes § 51-199 (b). We reverse the judgment of the trial court and remand the case for a new trial.

The jury could reasonably have found the following facts. At approximately 7 a.m. on October 23, 1986, the victim's body was found near Long Pond in Salisbury. Investigation revealed that the victim had been shot three times in the back of the head with a nine millimeter pistol earlier that morning. Prior to his death, the victim had been found guilty of committing an arson in connection with the burning of the Salisbury town hall. In the course of a state police investigation of that crime, the victim had informed the police that the defendant's brother, Roy Duntz, had participated with him in the arson. The victim had been scheduled for sentencing for the arson offense on October 24, 1986, the day following his death.

During the initial phase of the defendant's murder trial, the state offered a significant amount of circumstantial physical evidence that tended to link the defendant to the victim's death. The state introduced into evidence a newspaper, found in the defendant's bedroom several days after the victim's death, that contained a front page article regarding the victim's conviction of the town hall arson. Additionally, the state

---

[1] General Statutes § 53a-54a (a) provides in pertinent part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

introduced evidence that the victim's killer had left a hexagonal sneaker tread print at the murder scene and that the impression matched the tread design of a pair of Foot Joy sneakers that the defendant had possessed shortly before the crime. The state also produced evidence that fibers, microscopically similar to those in the carpet of the defendant's van, had been discovered on the victim's shoes. Regarding the murder weapon, the state introduced evidence that the victim had been killed with a nine millimeter Smith and Wesson pistol. It also offered proof that the defendant had possessed a pistol cleaning kit that could have been used to clean such a weapon, and that he had possessed a spandex belt that bore an impression of a nine millimeter Smith and Wesson pistol.

As the trial progressed, it became clear through the defendant's cross-examination of witnesses that one of his theories of defense was that his brother Roy had killed the victim to prevent the victim from further implicating Roy in the town hall arson. Midway through the presentation of the state's case, both Roy and another brother, Ronald Duntz, decided to testify against the defendant because they believed that the defendant was unfairly attempting to shift the culpability for the murder to Roy. Although neither Roy nor Ronald had implicated the defendant in the victim's murder prior to trial, at trial both brothers testified that the defendant had admitted to them that he had killed the victim. Roy and Ronald also provided an account of the events of October 22 and 23, 1986, that was indicative of the defendant's guilt.

On the other hand, the defendant in his testimony declared that he had not killed the victim and placed the blame on Roy. The defendant testified that his brother Roy had been afraid that the victim would testify against him regarding the town hall fire. The defendant further testified that, on the night of the vic-

tim's death, he had been present at Roy's home when he observed Roy and the victim leave together. The defendant testified that later that evening Roy had returned home alone and had said that he had killed the victim. Apparently crediting Roy's testimony instead of that of the defendant, the jury found the defendant guilty of the victim's murder.

On appeal, the defendant claims that the trial court improperly: (1) failed to suppress evidence that the state had seized in violation of article first, § 7, of the Connecticut constitution; (2) limited the jury's consideration of several prior statements to impeachment, rather than substantive, purposes; (3) admitted irrelevant and prejudicial evidence that the victim had feared the defendant; (4) allowed the state to commit prosecutorial misconduct by commenting upon matters not in evidence and violating the defendant's attorney-client privilege; (5) barred the introduction of evidence indicating that a defense witness had been administered and had passed a polygraph examination; (6) broadened the charging document by allowing the state to prove a motive for the crime other than that set forth in the information; and (7) admitted evidence of uncharged misconduct.

I

The defendant first claims that the trial court improperly failed to suppress evidence that the state had obtained in violation of article first, § 7, of the Connecticut constitution.[2] As a result, he asserts that he is entitled to a new trial. We agree.

---

[2] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

On October 24, 1986, members of the state police submitted an application for a search warrant and an attached affidavit to a judge of the Superior Court. The affidavit stated that, on the morning of October 23, 1986, the victim had been found dead as a result of multiple nine millimeter bullet wounds to his head, and that the state medical examiner had concluded that his death was a homicide. In their affidavit, the state police set forth information that they believed constituted probable cause to believe that the defendant had committed the homicide, and they requested authorization to search his apartment and van for specified evidence.

On October 24, 1986, the warrant application was approved and the search warrant was signed by the judge. The following day, the state police entered and searched the defendant's apartment and van. As a result of that search, the police observed and photographed hexagonal footwear impressions that were discovered in the dust inside the defendant's van. These impressions were similar to a sneaker impression that had been observed at the crime scene, near the victim's body. During their search, the police also photographed a pistol and revolver cleaning kit that could have been used to clean a nine millimeter pistol. Additionally, the police noticed a newspaper on the defendant's nightstand that contained an article about the victim's involvement in the town hall arson. Although the affidavit stated that a witness had informed the police that the defendant had been wearing blue sweat pants and a grey sweat shirt on the night of the offense, the police failed to discover any clothing matching that description. The police also failed to discover any footwear with a hexagonal tread pattern consistent with the impression discovered near the victim's body, and they also failed to discover a nine millimeter pistol.

Later that day, as a result of information gained in the initial search, the police applied for a second search

warrant to authorize another search of the defendant's van. A Superior Court judge signed the second warrant and, on October 26, 1986, the police again searched the van. In the course of the second search, the police seized, inter alia, a sample of the van's carpet. The police also took additional photographs of the footwear impressions in the rear of the defendant's van. Additionally, using a lifting technique, the police physically removed and preserved the footwear impressions that had been discovered in the dust in the van.

Largely upon the basis of the evidence seized in the course of the searches conducted on October 25 and 26, 1986, the state police obtained a third search warrant authorizing a further inspection of the defendant's apartment. On December 2, 1986, the police executed that warrant. As a result, the police photographed two newspapers containing articles concerning the victim and his involvement in the town hall fire. The police also photographed and seized a spandex belt that bore the imprint of a nine millimeter Smith and Wesson pistol. Additionally, the police seized a pistol and revolver cleaning kit similar to the one that had been photographed in the course of the October 25, 1986 search. Having determined that the footwear impressions at the crime scene and in the defendant's van were made by Foot Joy brand sneakers, the police also seized numerous photographs and photographic negatives depicting the defendant wearing Foot Joy sneakers.

Prior to trial, the defendant moved to suppress all of the evidence that had been obtained as a result of the searches of his apartment and van on October 25, October 26, and December 2, 1986. The defendant contended that the original affidavit contained insufficient information to establish probable cause to support the authorization of the October 25, 1986 search, and that the subsequent warrants that had been issued were based upon tainted information acquired in the origi-

nal illegal search. *Wong Sun* v. *United States,* 371 U.S. 471, 485–86, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

Prior to the introduction of any evidence at trial, the court held a suppression hearing. Following the hearing, the trial court ruled that the original warrant affidavit failed to establish the reliability or the basis of knowledge of the informants, and also failed to establish probable cause within its "four corners." See *State* v. *Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985). The court determined, however, that the police had executed the warrant in good faith and denied the defendant's motion to suppress. See *United States* v. *Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677, reh. denied, 468 U.S. 1250, 105 S. Ct. 52, 82 L. Ed. 2d 942 (1984); *State* v. *Marsala,* 19 Conn. App. 478, 563 A.2d 730 (1989), rev'd, 216 Conn. 150, 579 A.2d 58 (1990); *State* v. *Morrissey,* 18 Conn. App. 658, 560 A.2d 471 (1989), rev'd, 216 Conn. 185, 577 A.2d 1060 (1990).

The defendant points out that, subsequent to the trial court's denial of his motion to suppress on the basis of the good faith exception to the exclusionary rule, this court held that there is no good faith exception under article first, § 7, of the Connecticut constitution. *State* v. *Marsala,* 216 Conn. 150, 171, 579 A.2d 58 (1990). Accordingly, he now claims that the trial court improperly failed to suppress the evidence procured from his apartment and van, and that he is entitled to a new trial. The state concedes that there is no good faith exception under the Connecticut constitution and that the officers' searches were improperly justified by the trial court upon that basis. It argues, however, that the seized evidence was properly admissible because the information within the four corners of the original warrant affidavit sufficiently established probable cause, although a contrary determination was made by the trial court. The state notes that, at the time of the trial court's decision on the motion to suppress, the

court was bound to view information provided by unnamed informants in conformance with the two-pronged "basis in knowledge" and "veracity reliability" test developed in *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). See *State* v. *Kimbro,* supra. Since that time, we have held, in accordance with *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983), that article first, § 7, of the Connecticut constitution does not require rigid compliance with the *Aguilar-Spinelli* test. *State* v. *Barton,* 219 Conn. 529, 594 A.2d 917 (1991). Rather, in *Barton,* we held that the trial court should view information provided by a confidential informant under a "totality of the circumstances" test. Id.

Accordingly, the question now presented is whether, under our holding in *Barton,* the original warrant affidavit was sufficient to establish probable cause and, if not, whether the introduction of the testimony and evidence stemming from the searches of the defendant's apartment and van was harmless beyond a reasonable doubt. We conclude that the initial search warrant affidavit did not establish probable cause, and that the admission of the evidence that was obtained as a result of the first search and the subsequent searches that resulted from the first search was not harmless.

"The role of an appellate court reviewing the validity of a warrant is to determine whether the affidavit at issue presented a substantial factual basis for the magistrate's conclusion that probable cause existed." *State* v. *Johnson,* 219 Conn. 557, 565, 594 A.2d 933 (1991). "Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activ-

ity; and (2) there is probable cause to believe that the items named will be found in the place to be searched." *State* v. *Barton,* supra, 548. Both the state and the defendant agree that under the circumstances of this case, in order to satisfy the foregoing conditions, the issuing judge would necessarily have had to determine that there was probable cause to believe that the defendant killed the victim. "Probable cause, broadly defined, comprises such facts 'as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe' that criminal activity has occurred. *Stone* v. *Stevens,* 12 Conn. 218, 230, 30 A. 611 (1837); see also *State* v. *Middleton,* 170 Conn. 601, 604, 368 A.2d 66 (1976)." Id. Therefore, we must determine whether the affidavit contained sufficient information to persuade an impartial and reasonable mind not merely to suspect or conjecture, but to have a reasonable belief that the defendant intentionally caused the death of the victim. Id.

In determining whether the warrant was based upon probable cause, we may consider only the information that was actually before the issuing judge at the time he or she signed the warrant, and the reasonable inferences to be drawn therefrom. *State* v. *Shifflett,* 199 Conn. 718, 746, 508 A.2d 748 (1986). We view that information, however, in the light most favorable to the issuing judge's determination of probable cause, and "[i]n a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the magistrate's determination." *State* v. *Johnson,* supra, 565; see *In re Keijam T.,* 221 Conn. 109, 116, 602 A.2d 967 (1992).

We assess the value of information provided by unnamed sources by reviewing the totality of the circumstances set forth in the affidavit. *State* v. *Barton,* supra. Although, under that standard, we no longer

rigidly apply the two-pronged *Aguilar-Spinelli* test, "the determination of an informant's 'veracity' or 'reliability' and 'basis of knowledge' remains highly relevant. . . ." Id., 552. If information provided by an unnamed source is believable under the totality of the circumstances test, it may be credited and evaluated along with the other information in the affidavit. If, however, that information is not made more credible by the totality of the circumstances, it may not reasonably be believed and must be disregarded.

There are several pieces of information provided by unnamed sources in the original affidavit that the defendant claims may not be reasonably credited. First, he notes that paragraph seven of the original affidavit states: "That several independent sources of information have advised Investigators for the State Police that [the defendant] has threatened the life of [the victim] as a result of information that [the victim] provided to the State Police regarding the Salisbury Town Hall fire that implicated his brother, Roy Duntz, and also the pending testimony of [the victim] against Roy Duntz concerning Roy Duntz's involvement in that Arson. All of these sources of information out of sincere fear of [the defendant] and their own safety, have refused to document this information or testify in court as to this information."

Viewing the information in paragraph seven under the totality of the circumstances, we agree with the defendant that there is no basis to credit the information contained therein. Initially, regarding the informants' bases of knowledge, it is impossible to discern from the affidavit whether the sources of the police information personally heard the defendant threaten the victim, or whether they had been informed of the threats from some other source. Similarly, in *State* v. *Barton,* supra, the warrant affidavit failed to state explicitly whether the informant personally had

observed the facts that he had reported. There, we looked to the other facts contained in the affidavit itself and concluded that *"the affidavit* provided a substantial basis for the magistrate's inference that the informant was reporting events that he had personally observed." (Emphasis added.) Id., 549. In this case, there is nothing in the warrant affidavit that would allow the issuing judge reasonably to infer that the police sources had personally heard the defendant threaten the victim, and there is nothing else in the affidavit to indicate the sources' bases of knowledge.

Under the *Gates* test "[a] deficiency in one [of the *Aguilar-Spinelli* prongs] may be compensated for . . . by a strong showing as to the other, or by some other indicia of reliability." *Illinois* v. *Gates,* supra, 233. The warrant affidavit in this case, however, provides an insufficient showing as to the reliability of the unnamed sources referred to in paragraph seven, and is completely lacking in indicia of their opportunity to observe what they had reported. In other words, the affiants have failed to provide any background concerning the unidentified sources of police information that would allow the issuing magistrate to assess the veracity and reliability of those sources. Despite the state's assertion in its appellate brief that the sources were citizen informants, we are unable to discern from the affidavit whether the sources are uninterested citizens, or " 'criminals, drug addicts, or even pathological liars' " whose motives for providing information to the police may be far ranging and perverse. *State* v. *Barton,* supra, 542. The sole piece of information in the affidavit tending to suggest that the sources are reliable is the affiants' assertion that the sources feared the defendant. While the reliability of a source may be enhanced when the source provides information despite his fear of doing so, fear alone is insufficient to establish veracity and reliability to the extent necessary to

overcome a complete lack of information regarding the bases of the source's knowledge, and a complete lack of any other indicia of reliability. Accordingly, viewing the totality of the circumstances, the information indicating that the defendant had threatened the victim in the past could not reasonably have been credited.

The defendant also challenges paragraph eight of the affidavit, which stated "[t]hat another source of information (since the [victim's] Homicide) who due to sincere fear of [the defendant] would not document any information or provide testimony, but stated to State Police Investigators that [the defendant] was observed in the possession of a 9 MM Automatic Pistol." For the same reasons discussed regarding paragraph seven, this information could not reasonably have been credited.

Pursuant to *Barton*, however, even though we conclude that information provided by unnamed informants cannot be credited, we will uphold the issuance of a search warrant if other information in the affidavit establishes probable cause to conduct a search. Viewing the remaining information provided in the affidavit in the light most favorable to a finding of probable cause, the issuing judge could reasonably have found the following facts. On October 23, 1986, at 12:30 a.m., the victim was observed in the town of Salisbury and, at the same time, the defendant, who was alone, was observed driving his van in Salisbury. There is no indication in the warrant affidavit, however, that the defendant and the victim were seen together in Salisbury on that date. The victim was discovered dead at approximately 7 a.m. on October 23, 1986, and his death, a homicide, was the result of multiple nine millimeter gunshot wounds to the head. There is also a paragraph in the affidavit indicating that Roland McCabe,[3] another brother of the defendant, stated that

---

[3] The record does not explain the difference in surnames.

he had seen the defendant in possession of a weapon that "looked like" a nine millimeter pistol. The affiants failed to indicate when McCabe had made that observation, and the affidavit provides no reasonable basis from which the timing of his observation could be inferred. As a result, the issuing judge could have determined only that the defendant, who was thirty-eight years of age at the time of the warrant application, had, at some time in the past, possessed a nine millimeter pistol. Finally, the judge could have determined from the affidavit that the defendant had a criminal record that included two robbery convictions. Again, however, the affiants failed to specify the dates of the defendant's convictions, and that information could not be determined from the four corners of the affidavit.[4]

We have held that probable cause means more than mere suspicion, and that "even strong reason to suspect, [is] not sufficient to constitute probable cause . . . ." (Internal quotation marks omitted.) *State* v. *Shifflett,* supra, 748. Moreover, " 'physical entry of the home is the chief evil against which the . . . Fourth Amendment is directed,' and 'unless Government safeguards its own capacity to function and to preserve the security of its people, society itself could become so disordered that all rights and liberties would be endangered.' *United States* v. *United States District Court,* 407 U.S. 297, 312, 313, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972)." Id. In this case, the affidavit merely established that the defendant and the victim were in the same town on the morning of the victim's death, and that, at some time in the past, the defendant had possessed a handgun that "looked like" the type of handgun that had been used to kill the victim. Although the affidavit also contained information regarding the defendant's criminal record, "in the absence of simi-

---

[4] In fact, the two robbery convictions included in the affidavit dated back fifteen or sixteen years prior to the time of the warrant application.

lar methods of commission or other common features between otherwise unrelated crimes, we will not adopt a theory of probable cause" which depends upon a theory of general criminal propensity. Id. In summary, we conclude that the information contained in the initial warrant affidavit was insufficient to establish probable cause to believe that the defendant had killed the victim. Consequently, the evidence obtained pursuant to the first search warrant and ensuing warrants, which were based on information obtained in the search conducted under the authority of that warrant, must be suppressed because the searches violated article first, § 7, of the Connecticut constitution. See id.[5]

Although we conclude that the search was not properly based upon probable cause, the defendant is not entitled to a new trial if the introduction of illegally seized evidence was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 24–26, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967); *State* v. *Jones,* 215 Conn. 173, 184, 575 A.2d 216 (1990). "The test for harmfulness is whether there is a reasonable possibility that the improperly admitted evidence contributed to the conviction . . . . " (Citations omitted; internal

---

[5] In *State* v. *Shifflett,* 199 Conn. 718, 508 A.2d 748 (1986), we reviewed the adequacy of the information contained in an affidavit in support of a warrant to search the defendant's apartment. In that case, the defendant was charged with having sexually assaulted and murdered a woman. The warrant contained information from which the issuing judge could have inferred the following. The defendant possessed a Basque .380 handgun of the same type used to kill the victim. The defendant had not gone to work on the day of the offense. Additionally, the defendant's in-laws lived near the area where the victim was killed and the defendant was familiar with that area. Further, the defendant had recently committed two violent sexual assaults, both of which were accomplished at knife point. The defendant had strangled and left one of his sexual assault victims for dead. Finally, the defendant had committed an armed robbery several years before and he was "dangerously prone to violence." Id., 746. Even in view of that information, we held that it was "clear that the police had no probable cause to search the defendant's apartment." Id., 747.

quotation marks omitted.) *State* v. *Jones,* supra, 184–85; see *Schneble* v. *Florida,* 405 U.S. 427, 432, 92 S. Ct. 1056, 31 L. Ed. 2d 340 (1972); *State* v. *Hoeplinger,* 206 Conn. 278, 294, 537 A.2d 1010 (1988). " 'The harmlessness of an error depends upon its impact on the trier and the result, not upon whether the particular evidence involved was legally essential to support the finding.' " *State* v. *Hoeplinger,* supra, 295.

At trial, the state introduced evidence and testimony regarding the items that had been seized and observed in the defendant's apartment and van. Some of that evidence indicated that the defendant had been in the company of the victim shortly before or at the time of the victim's death. Henry C. Lee, chief criminalist at the state forensic laboratory, testified that the person who had left the hexagonal footprint found at the scene of the homicide had been in a position to have fired the bullets into the victim's head. Kenneth Zercie, a criminalist for the state forensic laboratory, testified that the laboratory had concluded that the tread mark found at the scene of the homicide had been left by a Foot Joy brand sneaker. The state introduced photographs and lifts of the footprints that had been discovered in the defendant's van, and introduced testimony that the footprints in the van matched that found at the scene of the homicide. Additionally, the state introduced seized photographs that depicted the defendant wearing the particular model of Foot Joy sneakers that Zercie testified had left the print at the scene of the homicide and those in the defendant's van. Furthermore, the vice president of the Foot Joy Shoe Company testified regarding the number of Foot Joy shoes of the model that the defendant was wearing that were on the American market at the time of the victim's death.

The state also introduced evidence that several blue fibers had been located on the sole of one of the vic-

tim's shoes. Douglas W. Deedrick, an agent of the Federal Bureau of Investigation, testified that he had compared the fibers located on the victim's shoe with the carpet that had been seized from the defendant's van, and that the two were microscopically similar. Deedrick further testified that the fibers had most likely been transferred from the carpet to the victim's shoe within a few hours before the victim's death. The evidence offered regarding the fibers would have allowed the jury reasonably to infer that the victim had been in the defendant's van shortly before his death, despite the defendant's denial of that fact.

The state also relied upon evidence that had been seized from the defendant's apartment to show that the defendant had possessed a nine millimeter pistol. At trial, the state introduced a spandex belt that had been seized, and also introduced photographs of that belt. A state police officer testified that, at the time of the search, he had observed the impression on the belt of a nine millimeter Smith and Wesson pistol, the model that the state theorized had caused the victim's death. The officer also testified that such belts were "commonly" used to conceal weapons. Furthermore, the state introduced the pistol cleaning kit that had been discovered in the defendant's apartment, and introduced testimony that the kit could have been used to clean a nine millimeter pistol. Additionally, the state introduced evidence that a nine millimeter bullet, matching those that had caused the victim's death, had been discovered in and seized from the defendant's apartment.

The state also introduced testimony that, although the police searched the defendant's apartment and van, they were unable to discover a nine millimeter pistol. Additionally, although the defendant had been observed wearing blue sweat pants and a grey sweatshirt on the night of the victim's death, those articles of clothing

could not be located in the defendant's apartment at the time of the searches. Furthermore, the police did not discover the pair of Foot Joy sneakers that the defendant was depicted as wearing in the photographs that the police had seized.

In its closing argument, the state relied heavily upon the evidence that had been discovered in the defendant's apartment and van and upon the inference that the defendant had intentionally discarded those items that could not be located during the searches. In the course of its closing argument, the state drew the jury's attention to the seized carpet fibers, the Foot Joy sneaker tread prints and the seized photographs of the defendant wearing Foot Joy sneakers, the seized spandex belt and photographs of the belt, the seized pistol cleaning kit and the photographs of the newspaper referring to the victim. After summarizing the evidence that linked the defendant to the crime scene, including the carpet fibers and the Foot Joy sneaker tread prints, the state commented, "[t]hat is the crime scene, that is the physical evidence which the State contends in and of itself, if the jury believes that, convicts this man Richard Duntz beyond a reasonable doubt of the crime of murder." The state also argued that the jury could infer that the absence of the clothing, sneakers and weapon from the defendant's apartment demonstrated a consciousness of guilt.

Although the state conceded at oral argument that the evidence gained as a result of the searches had been "very important" in the initial portion of the presentation of its case, it argues that the other evidence offered constituted overwhelming proof of the defendant's guilt. Particularly, the state asserts that, in addition to the physical evidence linking the defendant to the homicide, it had offered the testimony of several witnesses who claimed to have heard the defendant confess to killing the victim. Roy Duntz, Ronald Duntz and

Andrea Eichstedt each testified that the defendant had admitted to them that he had killed the victim.

In view of the quantity of illegally seized evidence that was admitted and the potential impact of that evidence, however, we cannot characterize the error in this case as harmless beyond a reasonable doubt. There remains a reasonable possibility that, absent all reference to the illegally seized evidence, the jury might have found the defendant not guilty. See *State* v. *Jones,* supra, 184. Accordingly, the defendant is entitled to a new trial at which the evidence, obtained as a result of the searches of the defendant's apartment and van on October 25, October 26 and December 2, 1986, must be suppressed.

Because a new trial is required, we will consider only those additional claims of the defendant that may recur at a retrial.

## II

The defendant makes two distinct claims that the trial court improperly failed to instruct the jury that it could consider certain statements for substantive purposes. He asserts that the court improperly failed to instruct the jury that: (1) certain statements attributed to Roy Duntz that were against his penal interest could be considered for their substance; and (2) a letter signed by Roy Duntz and sworn probable cause hearing testimony by Ronald Duntz could be considered for their substance. We agree that only the letter and probable cause hearing testimony should have been admitted for substantive purposes.

Prior to trial, Roy Duntz had failed to provide the police with any information indicating that the defendant had killed the victim. At trial, however, Roy stated that he felt that he now had to testify against the defendant because he believed that the defendant had

developed a scheme to blame him for the victim's murder. Thereafter, Roy testified that, on October 22, 1986, sometime after 11 p.m., the defendant and the victim had appeared at Roy's home. At that time, Roy had possession of the defendant's nine millimeter pistol. Out of the victim's presence, the defendant had asked Roy for the return of the gun and for something that looked like cocaine. Roy testified that he had given the defendant the nine millimeter pistol and some crushed aspirin, and that the defendant and the victim had driven away from his house together. Roy further testified that he had fallen asleep after the defendant and the victim left, but that he had been awakened by the defendant's return. Upon the defendant's return, Roy stated that the defendant had told him that he had shot the victim three times in the back of the head, killing him.

Evidence was also admitted, however, that tended to contradict Roy's testimony at trial. First, the defendant offered what has been characterized as a "deathbed letter." John R. Donovan, an attorney, testified that he had received a letter approximately three months prior to trial. The letter was contained in two envelopes, and the inner envelope bore Roy's return address and stated, "[a]ttention: Do not open until my death." Donovan testified that he became curious and opened the letter one month prior to trial. The six page letter, signed by Roy, stated that the letter was written by Roy so that, "in the event that something should happen to [him]," the innocence of his brother, the defendant, would be known. The letter, written after Roy had been hospitalized for a serious heart ailment, went on to say that in the early morning hours of October 23, 1986, Roy and the victim had been at Roy's house when the defendant had arrived there. The defendant said that he was drunk and was not feeling well, and went to lie down on the couch. At that time, Roy and the victim began to argue over cocaine, and

the victim threatened to stab Roy with a screwdriver. Thereafter, Roy and the victim left the defendant and drove to Long Pond where Roy had told the victim that he had some cocaine buried. At Long Pond, Roy and the victim continued to argue and the victim again threatened Roy with a screwdriver. In response to the second threat, Roy struck the victim in the head with a pistol and, as the victim spun around, the gun accidentally discharged, severely injuring the victim. Uncertain about what to do, Roy then shot the victim two more times in the head, and left the scene.

Roy testified that the letter that had been sent to Donovan had been composed by the defendant and that Roy, at the defendant's request, had copied it into his own handwriting. Roy stated that he had placed the letter into an envelope on which he had written that the letter was not to be opened until his death and had given it to the defendant. Roy stated that the contents of the letter were not true. Rather, he said that it was a story concocted by the defendant to create a reasonable doubt as to his own guilt. Roy testified that he had gone along with the scheme because he was not in good health and had wanted to help his brother escape punishment in the event that he died. The defendant, however, testified that the first time he had been aware of the contents of the letter was when it was introduced into evidence at trial, and that he believed that Roy, alone, had written the letter.

In addition to the deathbed letter, the defendant produced several witnesses who reported statements by Roy that contradicted his trial testimony. Richard Surdam testified that he had been hitchhiking in November, 1986, and that Roy Duntz had stopped and picked him up. Surdam testified that, while he was a passenger in Roy's truck, he had overheard Roy talking to himself about the victim's murder. Surdam stated that he had overheard Roy say that he was sorry about what

he had to do to the victim, but that he had to do it because the victim was talking too much. Finally, Surdam testified that Roy had said that after he had killed the victim he had hidden the murder weapon in a lake or a pond, and that it was so deep that the police would never find it. Anthony Gilliam then testified that Roy had told him that he had killed the victim so that the victim could not give the authorities information about the town hall fire. Ronald Bernal also testified that Roy had revealed information to him that significantly incriminated Roy in the victim's death. Finally, the defendant testified that Roy had admitted to him, on several occasions, that he, Roy, had killed the victim.

Ronald Duntz also testified at trial. He stated that the defendant had telephoned him during the early morning hours of October 23, 1986, and had requested a ride home because his van had broken down. Ronald testified that he had picked up the defendant and that, during their ride together, the defendant had informed him that he had shot the victim in the back of the head, killing him. Ronald also testified that the defendant had asked him to stop the car at the Farmington River, where the defendant left the car and threw a pair of sneakers into the water. In the course of his cross-examination of Ronald, the defendant questioned him regarding his testimony at a previous probable cause hearing. Ronald admitted that, at the probable cause hearing, he had testified that the defendant had said nothing to him during their ride together on October 23, 1986, and that he had testified that the defendant had never said that he had killed the victim.

Prior to the giving of jury instructions, the defendant requested that the trial court inform the jury that Ronald and Roy's inconsistent statements could be considered for their truth, as well as their impeachment value. In instructing the jury on the use of prior inconsistent statements, the trial court informed the jury

that such statements are "introduced not only to prove the truth of the facts contained in the statement, but as evidence of conduct inconsistent with his testimony on the witness stand." Immediately following its instructions on inconsistent statements, the trial court further charged the jury as follows. "In this case, Roy Duntz testified that he did not kill Earl Morey. Thereafter, witnesses for the defense, Ronald Bernal, Richard Surdam, Anthony Gilliam and Richard Duntz testified that Roy Duntz made statements about killing Earl Morey. Such said statements can be considered by you as prior inconsistent statements against Roy Duntz that would go to impeach his credibility. You are to consider this evidence in accordance with the instructions I have just given."[6]

## A

The defendant first claims that the out-of-court oral statements attributed to Roy Duntz that were against Roy's penal interests should have been admitted for their substance. We disagree.

" 'A trustworthy third party statement exculpatory of the accused and against the penal interest of the declarant is admissible at the trial of the accused *if the declarant is unavailable.' State* v. *Rosado,* 218 Conn. 239, 243–44, 588 A.2d 1066 (1991)." (Emphasis omitted and added.) *State* v. *Rivera,* 221 Conn. 58, 69, 602

---

[6] On appeal, the defendant asserts that there was an error in the transcription of the trial court's jury instructions. Particularly, he claims that the trial court actually instructed the jury that inconsistent statements are "introduced *not to prove* the truth of the facts contained in the statement. . . ." (Emphasis added.) The state contends, however, that there was no error in transcription and that the court instructed that inconsistent statements could be used "*not only to prove* the truth of the facts contained in the statement. . . ." (Emphasis added.) Because the disposition of this case is controlled by our resolution of the probable cause issue, we will not address this dispute over the accuracy of the transcription. In order to assist in the retrial of this case, we will address the substance of the defendant's claims.

A.2d 571 (1992). ''In any analysis of the admissibility of a declaration against penal interest, one must first determine whether the declarant is unavailable; if, and only if, this is shown by the proponent of the proffered hearsay statement will the court proceed to examinations of trustworthiness. *State* v. *DeFreitas,* 179 Conn. 431, 441–43, 426 A.2d 799 (1980); see also *State* v. *Frye,* 182 Conn. 476, 480–81, 438 A.2d 735 (1980).'' (Emphasis omitted.) *State* v. *Rivera,* 220 Conn. 408, 411, 599 A.2d 1060 (1991). Because the declarant, Roy, was available and, in fact, testified at trial, the statements attributed to him were not admissible for substantive purposes. *State* v. *Conroy,* 194 Conn. 623, 630, 484 A.2d 448 (1984).

The defendant also asserts that to bar the use of this evidence for substantive purposes would violate his constitutional right to present a defense under *Chambers* v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). We have held, however, that our rule requiring that the defendant meet the threshold requirement of demonstrating unavailability is consistent with the federal constitution and *Chambers.* *State* v. *Frye,* supra, 480–81 n.2. Accordingly, the testimony by Bernal, Surdam, Gilliam and the defendant concerning Roy's inconsistent statements should properly have been admitted only to impeach Roy's testimony, and not for substantive purposes.

## B

The defendant next asserts that the deathbed letter signed by Roy Duntz and the probable cause hearing testimony of Ronald Duntz should have been admitted for their substance pursuant to *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and its progeny. We agree.

We have held that " 'an exception to the hearsay rule is necessary to allow the trial court to admit for substantive purposes prior inconsistent statements given under prescribed circumstances reasonably assuring reliability.' . . . [Id., 752.] We therefore adopted a rule allowing the substantive use of prior written inconsistent statements where the declarant: (1) has signed the statement; (2) has personal knowledge of the facts stated; and (3) testifies at trial and is subject to cross-examination. Id., 753." (Emphasis omitted.) *State* v. *Grant,* 221 Conn. 93, 99, 602 A.2d 581 (1992). Further, we have held that the rule allowing the substantive use of certain prior inconsistent statements also applies to prior tape-recorded statements. Id.; see *State* v. *Alvarez,* 216 Conn. 301, 313, 579 A.2d 515 (1990).

The state concedes, as the defendant claims, that the deathbed letter signed by Roy properly falls within the category of statements that may be used substantively. Because the letter contained material that was inconsistent with Roy's testimony at trial, and the letter was signed by Roy, who was available for cross-examination, we concur that it should have been admitted for substantive, as well as impeachment purposes. Similarly, we conclude that the portions of Ronald's probable cause hearing testimony that were inconsistent with his testimony at trial should have been admitted for both impeachment and substantive purposes. *State* v. *Grant,* supra; *State* v. *Alvarez,* supra.

## III

The defendant further claims that the trial court improperly admitted several statements attributed to the victim for the purpose of demonstrating that he feared the defendant. We agree.

During the trial, the state elicited testimony from several witnesses indicating that the victim had made statements manifesting a fear of the defendant. James

D. Hiltz, Terry Milton and Frederick R. Milton each testified that the victim had told them that he was afraid of the defendant. Additionally, the state offered other testimony from which the victim's fear of the defendant could reasonably have been inferred. Hiltz testified that the victim had told him that he believed that the defendant was going to kill him. Hiltz also testified that, when the victim had provided the state police with information implicating Roy in the town hall arson, the victim had asked the state police to beat him up so that the defendant would think that the information about Roy had been forced from him. Terry Milton also testified that the victim had told her that he had asked the police to rough him up to create the illusion that the information about Roy had been beaten out of him. Frederick R. Milton testified that the victim had told him that "one of these days" the defendant would shoot him. Finally, Chris William Morey, the victim's brother, testified that he had heard the victim say, "if you find me dead . . . by a lake or a pond, Richard Duntz is the one that killed me and Roy knows all about it . . . ."

At trial, the defendant objected to the admission of this testimony, asserting that it was hearsay and irrelevant. In response to that objection, the state claimed that the evidence was relevant and that the hearsay rule did not bar its admission because it was being offered, not for its truth, but to establish the victim's state of mind. The trial court agreed with the state and admitted the evidence for the limited purpose of demonstrating that the victim feared the defendant. The defendant now argues that it was improper to allow the jury to use the testimony for that purpose.

"Hearsay is an out-of-court statement offered into evidence to establish the truth of the matters contained therein. *State* v. *Cruz,* 212 Conn. 351, 356, 562 A.2d 1071 (1989)." *State* v. *Rinaldi,* 220 Conn. 345, 359, 599

A.2d 1 (1991). As such, it is inadmissible. We have held, however, that " '[o]ut of court statements to a person are admissible to show his state of mind *where his mental state is relevant. . . .* " (Citations omitted; emphasis added.) *State* v. *Ruffin,* 206 Conn. 678, 683, 539 A.2d 144 (1988). The state claims that the instant testimony demonstrated that the victim's state of mind was one of fear of the defendant, and that that fear was relevant.

We conclude that the victim's alleged fear of the defendant was not relevant, and, therefore, that the testimony was not admissible under the state of mind exception to the hearsay rule. Evidence is relevant only if it has some tendency "to establish the existence of a material fact." (Internal quotations marks omitted.) *State* v. *Kelly,* 208 Conn. 365, 376, 545 A.2d 1048 (1988); *State* v. *Thomas,* 205 Conn. 279, 283, 533 A.2d 553 (1987). The state claims that the victim's alleged fear of the defendant was relevant because it tended to show that the victim and the defendant had an antagonistic relationship and, therefore, that the defendant had a motive and the intent to kill the victim. We conclude, however, that the jury could not have drawn such an inference solely from the statements of the victim without resorting to impermissible speculation. Indeed, the victim's expressed fear may have been subjective and unfounded. Particularly in view of the tremendous potential for this evidence of subjective fear to prejudice the defendant unfairly, we conclude that it was not admissible under the state of mind exception to the hearsay rule. *State* v. *Ruffin,* supra, 682–84.

IV

The defendant next claims that the state committed prosecutorial misconduct by arguing to the jury matters not in evidence and by violating the defendant's

attorney-client privilege. The defendant also claims that the trial court improperly allowed the state to commit the alleged misconduct. We disagree.

Early in the trial, defense counsel asked several of the witnesses, who had taken part in the investigation at the scene of the victim's death, whether they recalled having observed a screwdriver there. Counsel also asked one of the state police officers whether he recalled having observed a screwdriver in the victim's car. Additionally, defense counsel asked the medical examiner whether he had noticed any indication that the victim had been beaten prior to his death.

Subsequent to defense counsel's questions regarding the screwdriver and whether the victim had been beaten, Donovan testified that he had received the deathbed letter, and the letter was admitted into evidence. See part II, supra. The letter stated that Roy and the victim had gotten into an argument over cocaine at Roy's home, and that the victim had threatened to stab Roy with a screwdriver. Further, it stated that Roy and the victim had driven to Long Pond where they had continued to argue and the victim again had threatened Roy with a screwdriver. The letter also stated that Roy and the victim had become involved in a scuffle during which Roy had struck the victim in the head with a pistol. Other than the material contained in the deathbed letter, there was no other evidence offered at trial regarding a screwdriver or any beating of the victim prior to his death.

At trial, Roy testified that the letter had been composed by the defendant and that Roy had copied it into his own handwriting in order, in the event of his death, to assist the defendant in creating a reasonable doubt as to his guilt. According to Roy, therefore, the defendant had full knowledge of the contents of the letter prior to trial. The defendant testified, to the contrary, that

he had never seen the letter until it was introduced into evidence at trial. He stated that he had not composed the letter and that, prior to its introduction, he had had no knowledge of its contents.

On cross-examination, the state inquired of the defendant whether, "[w]ithin the first day and a half or two days of this trial, your defense counsel was questioning about the whereabouts of a screwdriver found at the scene of the crime, to which no one paid much importance to. And questions about whether or not there were inflictions of injuries to the face of Earl Morey?" Defense counsel objected to that question asserting that, as a result of the question, she might be required to become a witness in the case. Although the trial court overruled the objection, the defendant did not answer the question. The state continued the question, "[b]ut you didn't give that information relative to the screwdriver being used at your brother's location, at his house and again the screwdriver being used up at Long Pond, did you give that information?" The defendant then responded that he did not recall.

In its closing argument, the state asserted that the jury could properly infer that defense counsel had posed the questions about the screwdriver and the injuries to the victim because the defendant had informed her about the contents of the deathbed letter. Such an inference would be directly contrary to the defendant's testimony that he had had no knowledge of the letter, and would have tended to support Roy's testimony that the defendant had authored the letter. Defense counsel repeated her objection that such argument might require that she become a witness in the case. The trial court once again overruled that objection to the state's argument.

The defendant now asserts that the state's questions and closing argument constituted use of material not

in evidence and violated the attorney-client privilege. Specifically, the defendant asserts that the state improperly asked the jury to draw an inference that the defendant had lied based upon questions by counsel, which he claims were not in evidence. Furthermore, the defendant asserts that the state attempted to induce the jury to make improper use of privileged conversations between him and his attorney.

We first address the defendant's claim that the state relied upon facts not in evidence. " '[T]he privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, [but] it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider.' " *State* v. *Ubaldi,* 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). Statements or comments made by attorneys in the course of examination or argument are not facts in evidence, and may not properly be considered by the jury. See *Cologne* v. *Westfarms Associates,* 197 Conn. 141, 153–54, 496 A.2d 476 (1985).

The defendant asserts that the state's closing argument invited the jury to infer from defense counsel's questions that the defendant had provided her with information that he could not have possessed unless he had authored the deathbed letter. In doing so, however, the state did not request the jury to accept the truth of any material contained within defense counsel's questions. Rather, it merely asked the jury to consider the fact that the questions had been asked, a relevant circumstance in itself. We can conceive of no useful purpose in requiring the state to present testimony or other evidence to the jury to the effect that defense counsel had asked certain questions when the jury, itself, was present during the subject questioning. Therefore, we hold that, in these very narrow circumstances, the jury

should not be barred from drawing reasonable inferences from the fact that defense counsel had asked several specific questions in its presence, which questions were, in themselves, relevant to an issue in the case.

The defendant also claims that the state's argument violated the attorney-client privilege. Although we recognize that this issue may arise again upon retrial of this case, we decline to review it at this time. Initially, we note that the record reflects that the defendant never raised the attorney-client privilege issue at trial and, therefore, " 'did not advance his argument of [this issue] at trial in compliance with our rules.' *State* v. *Reid,* [193 Conn. 646, 663, 480 A.2d 463 (1984)]; see Practice Book § 4185." *State* v. *Grant,* supra, 107. Additionally, in his original brief, the defendant failed to provide citation to any relevant authority in support of this claim. Although the state addressed the defendant's claim in its brief, asserting that the attorney-client privilege was not violated, the defendant again failed in his reply brief to set forth any authority on this issue. Therefore, we are unable to undertake an adequate assessment of the defendant's claim.[7] See Practice Book § 4065.

## V

The defendant further claims that the trial court improperly prohibited him from introducing evidence

---

[7] Moreover, although some communications between attorney and client are privileged, in order to fall within that privilege the communications must be made in confidence and for the purpose of seeking legal advice. *State* v. *Burak,* 201 Conn. 517, 526, 518 A.2d 639 (1986); *State* v. *Gordon,* 197 Conn. 413, 423, 504 A.2d 1020 (1985); *State* v. *Cascone,* 195 Conn. 183, 186, 487 A.2d 186 (1985); *Doyle* v. *Reeves,* 112 Conn. 521, 523, 152 A. 882 (1931); C. Tait & J. LaPlante, Connecticut Evidence (1976) § 12.5. The defendant, however, has additionally failed to assert on appeal that there had been any confidential communications, regarding the deathbed letter, between him and his attorney, and, at trial, defense counsel explicitly denied that any such communication had occurred.

that a defense witness had been administered, and had passed, a polygraph examination. We do not agree.

As part of the defense case, as previously mentioned, Richard Surdam testified that in November, 1986, he had accepted a ride with Roy in Roy's truck and that, during the ride, Roy, while talking to himself, had spoken of having killed the victim. See part II, supra. On rebuttal, the state recalled state police officer David Carey. Carey testified that he had attempted to corroborate Surdam's story but that he had not been able to locate anyone who recalled Roy owning a truck similar to the one that Surdam had described. Further, Carey stated that although Surdam had stated that he had informed two other persons about his ride with Roy, Carey had spoken to those persons and they had not been able to recall such a conversation with Surdam. On cross-examination of Carey, the defendant attempted to introduce evidence that Surdam had successfully undergone a state police polygraph examination regarding the statements he had purportedly overheard. The trial court, however, found that evidence inadmissible.

The defendant now claims that he should have been permitted to introduce the results of Surdam's polygraph examination for purposes of rehabilitating Surdam following Carey's testimony. The defendant asserts that Carey's testimony that he was unable to corroborate Surdam's story was misleading. He claims that Surdam's performance on the polygraph examination constituted corroboration, and that the results of that examination should have been admitted.

Due to the questionable accuracy of the results of polygraph examinations, this court has consistently held that they are not admissible either for substantive or impeachment purposes. *State* v. *Plourde,* 208 Conn. 455, 470–72, 545 A.2d 1071 (1988), cert. denied,

488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989); *State* v. *Miller,* 202 Conn. 463, 485–86, 522 A.2d 249 (1987). Accordingly, the results of Surdam's polygraph examination were properly excluded.

## VI

The defendant also claims that the trial court's instructions to the jury improperly broadened the information by allowing the state to prove a motive other than that set forth in the information. Specifically, the defendant claims that the state asserted in the information that the defendant murdered the victim "with the motive of preventing the [victim] from testifying against [Roy Duntz]. . . ." The state argued and the court instructed, however, that the jury might find that the defendant was motivated by a desire to assert his authority as a cocaine dealer. Because this case will return to a pretrial posture following this decision, we believe that the defendant's claim of a variance between the information and the jury instructions is unlikely to recur upon retrial. See Practice Book § 623; *State* v. *Parker,* 25 Conn. App. 619, 595 A.2d 939 (1991). Accordingly, we decline to review the defendant's claim. *State* v. *Williams,* 202 Conn. 349, 365, 521 A.2d 150 (1987).

## VII

Finally, the defendant claims that the trial court improperly admitted prejudicial evidence regarding uncharged misconduct by the defendant. Particularly, he claims that the trial court improperly admitted evidence that "[painted the] defendant as a major controller of drug trafficking in Litchfield County. . . ." Although the defendant concedes that some evidence regarding the defendant's involvement in the sale and distribution of cocaine was properly admissible, he claims that such evidence should have been admitted

only to a more limited extent. Because our review of this claim would be of doubtful utility upon retrial, we decline to review it.

" 'The rules governing the admissibility of evidence of a criminal defendant's prior [or subsequent] misconduct are well established.' *State* v. *Sierra,* 213 Conn. 422, 428, 568 A.2d 457 (1990). Although as a general rule such evidence is inadmissible as proof of the defendant's guilt of the crime charged based on his propensity to commit crimes, it is admissible for many other purposes, such as proof of intent, identity, malice, motive, a system of criminal activity, or an element of the crime. Id., 428–29. Such evidence may also be used 'to corroborate crucial prosecution testimony.' *United States* v. *Everett,* 825 F.2d 658, 660 (2d Cir. 1987)." *State* v. *Mooney,* 218 Conn. 85, 126, 588 A.2d 145, cert. denied,     U.S.     , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991). In determining whether to admit evidence under one of these exceptions, the trial court has discretion to determine whether the evidence is relevant to a material issue and whether the probative value of the evidence outweighs its prejudicial effect. Id., 127; *State* v. *Marra,* 215 Conn. 716, 738, 579 A.2d 9 (1990).

The admissibility of the challenged evidence may only be determined in view of the particular theories of the state and the defendant, and in view of the specific evidence offered in support of those theories. Such a determination is best made by the trial court, which is in a better position to evaluate the potential impact of the evidence upon the particular jury. Because the circumstances that will exist at retrial are unknown at this time, and because it is unclear whether this issue will recur upon retrial, we decline to address this issue. *State* v. *Williams,* supra.

The judgment is reversed and the case is remanded for a new trial.

In this opinion PETERS, C. J., GLASS and BORDEN, Js., concurred.

BERDON, J., concurring. Because I cannot embrace the majority opinion in *State* v. *Barton,* 219 Conn. 529, 594 A.2d 917 (1991), which adopted the "totality of the circumstances" test for the determination of probable cause under the state constitution and overruled, in part, *State* v. *Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985), in part I of the decision in this appeal, I concur only in the result.

I agree with Justice Glass' dissent in *Barton* and I believe that reference to parts of it would be helpful at this time. " 'In whatever form, I fail to see how the elusive *Gates*[1] approach will continue to guarantee the people of Connecticut "the full panoply of rights" that they have come to expect as their due.' The rights guaranteed to our citizens under article first, § 7, of the Connecticut constitution ' "belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." ' *Illinois* v. *Gates,* [462 U.S. 213, 274–75, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983)] (Brennan, J., dissenting). After today's toppling of the analytical framework of the *Aguilar-Spinelli* test,[2] the principles of which the majority deems procedural encrustations that unduly inhibit a

[1] *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983).

[2] *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964).

magistrate's 'discretion in the determination of probable cause,' just what remains to control that discretion, or for that matter, to guide the conduct of the warrant seeking police? Such actors, unfettered by meaningful standards by which to discharge their respective functions in the warrant process, are now granted the unbridled play to accord weight to their subjective preferences in determining the 'circumstances' whose 'totality' permissibly adds up to probable cause. See Y. Kamisar, *'Gates,* "Probable Cause," "Good Faith," and Beyond,' 69 Iowa L. Rev. 551, 571 (1984).

" '[C]onsisting largely of an exhortation to use common sense,' the *Gates* approach thus 'enhances the risk that probable cause determinations will be grounded more upon the predilections of the decision-maker and less upon established principles of law . . . .' W. LaFave, 'Fourth Amendment Vagaries (Of Improbable Cause, Imperceptible Plain View, Notorious Privacy, and Balancing Askew),' 74 J. Crim. L. & Criminology 1171, 1190 (1983). That risk is not perceptibly diminished by the 'reasonably' established by 'other objective indicia of reliability' standard that the majority would apply where a warrant proves deficient under both prongs of the remains of *Aguilar-Spinelli.* Absent ascertainable guidelines, what 'other' 'indicia' objectively display the requisite magnitude of reliability to 'reasonably' establish probable cause depends on the eye of the beholder, whether a police officer, a magistrate or a reviewing court." *State* v. *Barton,* supra, 555–56 (*Glass, J.,* dissenting in part).

Accordingly, in part I, I concur only in the result.